IRVING, J.,
 

 for the Court.
 

 ¶ 1. Muriel Penny was convicted in the Tate County Circuit Court of fondling a six-year-old girl. The trial court sentenced him to fifteen years, with nine years suspended, in the custody of the Mississippi Department of Corrections. Penny appealed his conviction, and in December 2006, this Court affirmed the trial coui't’s judgment.
 
 Penny v. State,
 
 960 So.2d 533, 541(¶ 31) (Miss.Ct.App.2006). In December 2007, Penny filed an application with the Mississippi Supreme Court for leave to file a post-conviction relief motion in the trial court. A panel of supreme court justices granted the motion, finding that Penny’s newly-discovered-evidence argument warranted review. Therefore, the supreme court ordered that an evidentiary hearing be held.
 

 ¶ 2. On February 1, 2008, the hearing was held in the Tate County Circuit Court, and Penny’s wife, Jearlene, provided the only testimony. On March 12, 2008, the trial court denied Penny’s motion. Penny appeals and asserts: (1) that the trial court abused its discretion in refusing to allow a witness to testify at the evidentiary hearing, (2) that the trial court erred in finding that he failed to produce documentation to support his allegations, and (3) that the trial court erred in excluding as hearsay the evidence that he offered.
 

 ¶ 3. Finding no reversible error, we affirm.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 ¶ 4. In his post-conviction relief motion before the trial court, Penny stated that Sydatrius Futrell (Shay) was the only witness that connected him to the crime. He contended that Lakesha Porter was a newly discovered witness who would contradict Shay’s testimony in a material way which, in his opinion, would have altered the out
 
 *519
 
 come of his trial had she been discovered prior to trial.
 

 ¶ 5. In denying Penny’s motion, the trial court stated the following:
 

 The proof presented at the hearing consisted totally of hearsay. The “new evidence” which Penny alleges consists of certain information which would hurt the credibility of the victim’s testimony at trial. One such bit of evidence was that the child in an interview with a child psychologist said that she was watching a particular children’s show which supposedly only comes on cable television and only at certain times. [Jearlene] testified at the hearing that the home where an event supposedly took place did not have cable television and the show was not on at the time of a specific incident. [Jearlene] presented no documentation. Also, [Jearlene] testified that [Shay] stated that [Shay] went to a specific football game on the night of one of the incidents and that [Jearlene] now has proof that the particular* football game did not occur on that night. Again, [Jearlene] produced no documentation. [Jearlene] also testified that a particular witness, Connie Blair, who testified at trial, now says that [Jane]
 
 [1]
 
 was not at the home where the crime allegedly occurred, but was at the Blair home at the time a specific incident occurred. Blair did not testify at the hearing. All of this evidence was available at the time of the trial. The witnesses actually testified at trial and could have testified to this evidence at the time of the trial. Penny was convicted of a lesser charge which in the indictment occurred over a span of time. Penny was acquitted of the count which occurred on a specific date.
 

 The only evidence that could remotely be considered new evidence was the hearsay testimony that [Shay], who testified at trial that she saw something supposedly, told [Porter] that [Shay] was only
 
 told
 
 of the event by [Jane] and
 
 not that [Shay] actually witnessed
 
 it.
 
 [2]
 
 [Shay], who did not testify at the hearing, but who testified at trial, was subject to cross-examination at the trial and was thoroughly questioned regarding whether she was told or whether she witnessed the event. The only evidence of this at this point is an affidavit of [Porter] who had a telephone conversation with [Shay]. Most of the evidence presented at trial was purely hearsay. Only one of the persons who submitted affidavits in support of the petition actually testified and her testimony was purely impeachment evidence.
 

 (Footnotes added).
 

 ¶ 6. As stated, Jearlene was the only witness to testify at the evidentiary hearing that was held pursuant to the supreme court’s mandate. In this appeal, Penny first asserts that the trial court erred in refusing to allow Porter to testify at the evidentiary hearing, arguing that Porter’s testimony would have established that the “State’s only witness linking [him] to the
 
 *520
 
 alleged abuse lied under oath.” We note at the outset that the record does not bear out Penny’s assertion. The transcript of the evidentiary hearing reveals that Porter was present at the hearing; however, our review of the transcript does not reveal any instance where either Penny or Porter expressed an interest in having Porter testify and was denied the opportunity to do so.
 

 ¶ 7. Porter’s cousin, Shay, testified at Penny’s trial but did not testify at the evidentiary hearing. However, Jearlene testified as to her recollection of Shay’s trial testimony. The following is a summary of Jearlene’s account of Shay’s trial testimony:
 

 On the day that the abuse is alleged to have occurred, Shay, Jane, and Erlando were at the Penny residence watching videos and playing video games. Jane entered Erlando’s bedroom where Shay and Erlando were and instructed them to smell her hand; Jane then requested that they follow her. Jane led them to Penny’s bedroom where Jane went over to Penny and “put her hand on his private area.” Shay and Erlando went downstairs for a brief period. Upon their return, they observed that Penny had his hand on top of Jane’s hand which was placed on Penny’s genitals on top of his clothing.
 

 Sometime after Penny’s trial, Porter provided an affidavit wherein she stated that Shay had admitted to her, during a telephone conversation that occurred two weeks after the trial, that she had been “under pressure to tell a lie.” Porter claims that she did not learn of the possibility that Shay’s trial testimony may not have been truthful until after Penny had been convicted. Porter’s affidavit reads as follows:
 

 Shay is my cousin and we live down the street from the Penny house and the Thomas house, Shay’s grandmother. About two weeks after they went to court, I was talking to Shay on the phone. I asked her to tell me the truth, what did you really see or did you see anything[?] She said, “really ... to tell you the truth, I was under pressure to tell a lie.” I asked her, why? She said, “to help [Jane] and beside[s] they told us what to say.” I said, “Well, Shay, you are known for lying, but why did you have to lie?” She said, “I don’t know.” I asked [Shay] if [Jane] told her to lie for her. She said[,] “no.” I asked [Shay] if [Jane] told [Shay] that [Jane’s] grandfather touched her in a nasty way. [Shay] said[,] “yeah, but I know [Jane] was lying because he was outside.” I said, “what really happened?” Shay said, “[Jane] told me he touched her but [Shay] didn’t really see it, so [Shay] can’t say it is true or not.” I told her I just wanted to know what really happened. Shay said[,] “Please don’t tell my mother that I lied, okay.” I told her “okay” and that was the end of the conversation.
 

 ¶ 8. We disagree with Penny’s contention that Porter provides any new evidence that would have materially altered the outcome of the trial had it been discovered prior to trial. In her affidavit, Porter describes what appears to be an entirely different incident than the one about which Shay testified at trial, an incident that was not the subject of Penny’s indictment. Accordingly, this Court agrees with the trial judge that, as shown by the affidavits and testimony presented at the evidentiary hearing, all of the evidence that Penny characterizes as newly discovered evidence is nothing more than hearsay and impeachment evidence.
 

 ¶ 9. Next, Penny argues that the trial court erred in finding that he did not produce any documentation to support his
 
 *521
 
 allegations at the evidentiary hearing. At the hearing, Jearlene testified that Jane testified during the trial that a particular program was on television at the time that the incident allegedly occurred. Jearlene also informed the court that she had a television schedule that, according to her, proved that Jane’s testimony regarding when the incident occurred was not credible. The record does not indicate any effort on the part of either Jearlene or Penny to introduce the schedule or to have the trial court review it, but even if they had made the effort, it would not have mattered because it, at best, was nothing more than impeachment evidence. While the trial judge stated that Penny produced no documentation to support his allegations, it is clear that what the trial judge meant was no documentation regarding newly discovered evidence, since the purpose of the hearing was to determine if any new evidence existed. Therefore, the trial court was correct in finding that Penny produced no documentation because the television schedule did not qualify as newly discovered evidence. In
 
 Brewer v. State,
 
 819 So.2d 1169, 1172(¶ 10) (Miss.2002) (quoting
 
 Ormond v. State,
 
 599 So.2d 951, 962 (Miss.1992)), the Mississippi Supreme Court held that:
 

 Newly discovered evidence warrants a new trial if the evidence will probably produce a different result or verdict; further, the proponent must show that the evidence
 
 “has been discovered since the trial, that it could not have been discovered before the trial by the exercise of due diligence,
 
 that it is material to the issue, and that it is not merely cumulative, or impeaching.”
 

 (Emphasis added). Jearlene testified that the printouts were from 2004; thus, we find that they were available in July 2005, when Penny went to trial. There is no merit to this issue.
 

 ¶ 10. In his final issue, Penny asserts that the trial judge erred in concluding that “[t]he proof presented at the hearing consisted totally of hearsay.” As he argued in his first issue, Penny again argues that the trial judge erred in refusing to allow Porter to testify at the evidentiary hearing. We decline to address this issue further, because we have already concluded that the trial court did not refuse to allow her to testify and because Penny asserts no new arguments to support this issue.
 

 ¶11. THE JUDGMENT OF THE TATE COUNTY CIRCUIT COURT DENYING THE MOTION FOR POST-CONVICTION RELIEF IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TATE COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . We have changed the name of the child to protect her identity.
 

 [2]
 

 . The trial judge's summary of Jearlene's testimony concerning what Shay allegedly told Porter is not quite accurate. Jearlene’s testimony at the evidentiary hearing was that Shay told Porter that Shay did not witness the incident about which Shay testified but that it was told to her by Jane. This was an incident where Shay and Jearlene’s grandson, Erlan-do, allegedly had observed Penny with his hand on top of Jane's hand that was placed on Penny’s genitals on top of his clothing. On the other hand, Porter’s affidavit says that Shay told Porter about an incident where Jane’s grandfather (Penny) had touched Jane inappropriately, rather than an incident where Shay and Erlando had observed Penny’s hand on top of Jane’s hand.